IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 10, 2007

STATE OF TENNESSEE v.
HENRY COOPER and LAWRENCE M. WALKER

Direct Appeal from the Criminal Court for Shelby County
No. 04-07895     Joseph B. Dailey, Judge

No. W2006-02482-CCA-R3-CD  - Filed January 16, 2008

Co-defendants, Henry Cooper and Lawrence M. Walker, were indicted on one count of attempted first degree premeditated murder and two counts of especially aggravated kidnapping. Following a jury trial, co-defendants were convicted of attempted second degree murder, a Class B felony, and were found not guilty of especially aggravated kidnapping. Following a sentencing hearing, the trial court sentenced Defendant Cooper as a Range I, standard offender, to twelve years, and Defendant Walker, as a Range I, standard offender, to eleven years. On appeal, each Defendant challenges the sufficiency of the convicting evidence, and Defendant Cooper challenges the length of his sentence. Defendant Walker does not challenge his sentence on appeal. After a thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which DAVID G. HAYES and NORMA MCGEE OGLE, JJ., joined.

Coleman W. Garrett, Memphis, Tennessee, for the appellant, Henry Cooper; Robert Wilson Jones, District Public Defender; Jennifer Johnson, Assistant Public Defender; and Garland Ergüden, Assistant Public Defender, Memphis, Tennessee, for the appellant, Lawrence Montez Walker.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; William L. Gibbons, District Attorney General; Dean Decandia, Assistant District Attorney General; and Paul Hagerman, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

**I. Background**

Mary McKinney testified that she lived in a ground floor apartment in the Rolling Hills Apartment complex. Ms. McKinney said that a young African-American man knocked on her door

asking for help during the early morning hours of July 15, 2004. Ms. McKinney said that the young man was bleeding. He sat on her front stoop talking on a cell phone while Ms. McKinney called 911. Ms. McKinney said that the man knocked on other apartment doors before she responded to his request for help. On cross-examination, Ms. McKinney said that she did not see anyone else in the vicinity and had not heard the sound of gunfire.

Undra Miller, the victim in this case, acknowledged that he was incarcerated at the time of trial on a theft charge and had numerous prior convictions. The victim said that he had known both co-defendants for many years. The victim testified that he and Defendant Cooper were members of the Gangster Disciples, and he had previously been involved in drug transactions with Defendant Cooper. The victim said that he had sold various types of pills.

The victim said that Defendant Cooper called him on July 14, 2004, and accused the victim of acting as a confidential informant for the Memphis Police Department. The victim denied the accusation. Brian Ellis, another acquaintance of the victim's, called the victim later that day and asked to purchase "four bars" of Xanax. The victim said that he arranged to meet Mr. Ellis at the M & M Express. The victim arrived at the location between midnight and 1:00 a.m. as Mr. Ellis was pulling into the parking lot in a black Buick Roadmaster. Co-defendants were with Mr. Ellis.

The victim said that he got in the car and gave some Xanax pills to Mr. Ellis and Defendant Walker. Defendant Cooper asked the victim if he wanted to get something to eat at Defendant Cooper's girlfriend's apartment, and the victim agreed. The victim stated that he had ingested both Xanax and Promethazine prior to meeting the men, and he fell asleep on the ride. The victim woke up as Mr. Ellis pulled into an apartment complex. Defendant Cooper got out of the car and walked quickly away from the vehicle. Mr. Ellis got out and stood in front of the vehicle lighting a cigarette. The victim also exited the vehicle and asked Mr. Ellis for a light. The victim said that Mr. Ellis struck him in the face "out of nowhere." The victim struggled with Mr. Ellis and heard a car door slam. He heard the sound of running feet and then a "pow." The victim realized he had been shot in the back of the head. The victim grabbed Mr. Ellis and pulled him around so that Mr. Ellis was between himself and Defendant Walker who had a gun in his hand. Defendant Walker fired two or three shots at the victim. The victim struggled with Mr. Ellis and managed to retrieve Mr. Ellis' gun.

The victim said that he ran toward the apartment buildings. He kept hearing gun shots. The victim turned around and saw that Mr. Ellis had a second weapon and was firing it toward the victim. The victim said that he was shot in the back of the head again and nearly flipped over. He saw a dark silhouette emerge from behind one of the apartment buildings and fire a gun in the victim's direction. The victim said that he believed the shooter was Defendant Cooper because that was the direction in which Defendant Cooper had gone when he exited the vehicle.

The victim fell into a deep ditch and lost consciousness. When he came to, he crawled out of the ditch and began knocking on apartment doors seeking help. The victim said a woman finally acknowledged his presence. The victim asked her where he was, and then the victim called 911 on his cell phone. The victim believed that he was going to die. He remembered talking to a police

officer at the scene but did not recollect the transport to the hospital. The victim laid Mr. Ellis' gun down in a stairwell. The victim said that he also had some Promethazine pills in his pocket. From a photographic line-up, the victim identified Mr. Ellis, Defendant Walker, and Defendant Cooper as the perpetrators of the offense.

The victim said that the doctor was not able to remove two bullet fragments from his head because they were lodged near his spine. The victim said he suffered from insomnia and headaches, and that his jaw would periodically slip out of place.

On cross-examination, the victim said that the investigating officers did not ask him about his affiliation with the Gangster Disciples or his drug dealings. The victim said that he did not see a weapon while he was in the car and reiterated that Defendant Walker fired the first shot. The victim said that he took a nine millimeter gun from Mr. Ellis.

The victim gave a statement to the police the day after the shooting. The victim acknowledged that he initially told the police that he did not recall Defendant Walker participating in the shooting. The victim told the investigating officers that he had seen Defendant Walker right before the shooting, and then Defendant Walker and Defendant Cooper walked toward one of the apartment buildings. The victim said, however, that he told the 911 operator that Defendant Walker and Mr. Ellis shot him. The victim acknowledged that under Mr. Elllis' photograph in the photo line-up, he wrote, "This [is] Bryan Ellis who shot me first." Under Defendant Cooper's photograph, the victim wrote, "This is [Defendant] Cooper who shot me." The victim acknowledged that he did not write anything under Defendant Walker's photograph.

On redirect examination, the victim said that he was still under the influence of medication when he gave his initial statement to the police. The victim insisted that both Defendant Walker and Mr. Ellis discharged their weapons at him.

Officer Sean Silvers with the Memphis Police Department was the first police officer on the scene. Officer Silvers determined that the victim had been shot in the back of the neck. Officer Silvers retrieved a bag of pills from the victim's pockets and located a semiautomatic black handgun in a stairwell approximately twenty yards away. Officer Silvers said that the victim told him that he had been shot by Defendant Cooper and Mr. Ellis. The victim said that he had been brought to the apartments in a dark colored Buick Roadmaster. Blood spatter was discovered on the mailboxes near where the victim was found, and a trail of blood was on the concrete in front of the apartment building.

On cross-examination, Officer Silvers said that he arrived at the crime scene between 1:30 and 2:00 a.m. Officer Silvers acknowledged that the victim did not mention Defendant Walker's name.

Stephen Utley, a paramedic for the Memphis Fire Department, testified that the victim was still alert and oriented as to time and place when he arrived on the scene.

Sergeant Robert Willie, a detective with the Memphis Police Department, interviewed the victim on July 16, 2004. The nursing staff advised Sergeant Willie that the victim was still in critical condition, but he was able to talk. Sergeant Willie testified that the victim identified three perpetrators. Sergeant Willie was able to locate photographs of Mr. Ellis and Defendant Cooper but could not find a record of Defendant Walker because Mr. Ellis had identified him only by Defendant Walker's nickname, Montez. Sergeant Willie showed the victim a photographic line-up containing Mr. Ellis' and Defendant Cooper's photographs on July 16, 2004, and the victim identified the two men as the perpetrators.

Lieutenant Paul Wright, Jr., with the Memphis Police Department, was able to develop Defendant Walker as a suspect based on the name, "Montez." The victim identified Defendant Walker's photograph on July 16, 2004. Lieutenant Wright said that the victim was in pain during the interview, but he was sitting up and able to talk.

On cross-examination, Lieutenant Wright said that the victim indicated that Defendant Cooper and Mr. Ellis had shot him instead of Defendant Walker. Lieutenant Wright investigated the general area where the shooting occurred but was unable to locate any shell casings. Lieutenant Wright acknowledged that the victim's initial statement just placed Defendant Walker at the scene and did not indicate that Defendant Walker had actively participated in the shooting.

Alpha Gail Hinds, with the Memphis Police Department's crime response unit, found a cigarette pack and a five dollar bill near where the victim was found. The nine millimeter gun found in the stairwell had six live rounds in an eight round clip.

Derrick Renard Johnson testified that he was incarcerated in the Shelby County Justice Center in July 2004, and Defendants Cooper and Walker were in his pod. Mr. Johnson said that Defendant Cooper was depressed after his preliminary hearing. Defendant Cooper had thought he was going to be released because the victim had not said that Defendant Cooper shot at him. Defendant Cooper and Defendant Walker told Mr. Johnson about the shooting while the three men were in Mr. Johnson's cell.

According to Mr. Johnson, Defendant Cooper believed that the victim had "snitched on him" and caused Defendant Cooper to be incarcerated on drug charges. Defendant Cooper and Defendant Walker called the victim at the hotel where he was staying. They told the victim that they were going to get something to eat, "get high," and "mess with some females," in order to lure the victim out of the hotel. Defendant Cooper, Defendant Walker, and Mr. Ellis drove the victim to the Rolling Hills apartment complex in a Buick Roadmaster. Defendant Cooper told the victim that the women lived at the complex and pretended he was talking to a woman on his cell phone.

Defendant Cooper told Mr. Johnson that Mr. Ellis was supposed to shoot the victim in the back of the head six times, but things did not go as planned. Mr. Ellis and the victim instead got into an altercation, and Mr. Ellis was only able to fire two shots. Defendant Cooper said that he believed that the victim was shot in the back of the head, but the victim ran away. Defendant Walker got out

of the vehicle and also shot at the victim. Defendant Cooper told Mr. Johnson that he assumed the victim would die from the gunshot wounds when they did not see him again.

Mr. Johnson said that Defendant Cooper did not say that he had shot at the victim. Mr. Johnson said that Defendant Cooper told him that he and Mr. Ellis had previously committed a murder together, and Defendant Cooper did not know why Mr. Ellis had "botched" this one. Mr. Johnson said that he contacted the Memphis Police Department after this conversation because he did not feel it was right to take someone's life. Mr. Johnson gave a statement to the police concerning the conversation.

On cross-examination, Mr. Johnson acknowledged that his bond was reduced and he was able to leave the Justice Center about two weeks after his conversation with Defendant Cooper, but he denied that he had been made any promises in exchange for his statement to the police. Mr. Johnson denied that he had seen Defendant Cooper's papers about the charges against him although he acknowledged that it was impossible to secure personal belongings in the jail. Mr. Johnson said that it was possible to overhear conversations when someone was using the pod telephone.

Defendant Cooper testified on his own behalf. Defendant Cooper said that he had known the victim for approximately ten years. Defendant Cooper denied that he had ever been a member of a gang but said that the victim was a member of the Gangster Disciples. Defendant Cooper denied that he had ever had any drug dealings with the victim. Defendant Cooper denied that he had accused the victim of being a police informant, and testified that he did not have any reason to be upset with the victim.

Defendant Cooper said that the victim called Mr. Ellis and told him that he had four bars of Xanax. Defendant Cooper took Mr. Ellis to the M & M Express to meet the victim. The victim opened the car door and talked to Mr. Ellis. Defendant Cooper said that he observed a police car approaching the parking lot. He told the victim to get in the vehicle, and then he drove off.

Defendant Cooper said that he had business with a man in the Frayser area of Memphis and drove there after the victim got in the vehicle. The victim and Mr. Ellis argued in the car about money that Mr. Ellis owed to the victim. Defendant Cooper could not locate the man and pulled into the driveway to the Rolling Hills Apartments. Defendant Cooper got out of the vehicle and called the man on his cell phone. The victim and Mr. Ellis continued to argue so Defendant Cooper got out of the vehicle and walked away as he talked on his cell phone.

Defendant Cooper said that he saw the victim and Mr. Ellis get out of the vehicle, still arguing. Defendant Cooper turned the corner of one of the apartment buildings and heard gunfire. He dropped to the ground and started running back to the car. Defendant Cooper said that Mr. Ellis and the victim were not around when he got back, and Defendant Walker was sitting in the front passenger seat. Defendant Cooper and Defendant Walker drove away.

Defendant Cooper said that he later learned that the police officers were looking for him in connection with the shooting. Defendant Cooper said that he voluntarily turned himself in during a court appearance on an unrelated charge on July 22, 2004. Defendant Cooper said that he was moved to Mr. Johnson's pod on August 24, 2004.

Defendant Cooper denied that he had any conversation with Mr. Johnson about the shooting. Defendant Cooper acknowledged that he was upset after the preliminary hearing because he had not played any role in the shooting. Defendant Cooper said that he talked to a friend about the preliminary hearing on the pod telephone and that Mr. Johnson's cell was next to the communal telephone. Defendant Cooper also said that he had various papers in his cell concerning the shooting, including the affidavit of complaint.

On cross-examination, Defendant Cooper acknowledged that he did not call 911 or the police after the shooting occurred. Defendant Cooper said that he was attempting to purchase marijuana on the night of the shooting.

Defendant Walker testified that he had known the victim approximately ten years. On July 14, 2004, Defendant Walker arranged to meet Defendant Cooper and "hang out." Defendant Walker said that he did not know that Mr. Ellis was going to be with Defendant Cooper. Defendant Cooper pulled in the parking lot in front of the M & M Express, and the victim jumped into the car. Defendant Walker said he did not know they were going to pick up the victim. Defendant Walker said that he did not buy any pills from the victim, and, as far as he knew, the victim did not sell any pills to Mr. Ellis.

Defendant Walker said he fell asleep and woke up again as Defendant Cooper was pulling into the Rolling Hills Apartments. Defendant Cooper got out of the car. Defendant Walker said he heard the victim say something about money to Mr. Ellis, and Mr. Ellis ignored him. Mr. Ellis got out of the car followed by the victim. Defendant Walker said he got out and was leaning into the front seat for his cigarettes when he heard gun shots. Defendant Walker said he crouched down in the vehicle's front seat. In a few seconds, Defendant Cooper walked up to the car, and he and Defendant Cooper drove away.

Defendant Walker said that the investigating officers initially interviewed him as a witness, not a suspect. Defendant Walker said that he discovered that he was implicated in the shooting after Defendant Cooper's preliminary hearing. Defendant Walker denied that he talked to Mr. Johnson at the Justice Center while Defendant Walker was incarcerated on other charges. Defendant Walker denied that he was armed during the shooting, but he said that the victim usually carried a weapon.

On cross-examination, Defendant Walker said that he did not see who shot the victim. He said that Defendant Cooper did not carry a gun "at that time," and he did not see a gun on Mr. Ellis. He acknowledged it was possible that Defendant Cooper shot the victim, and that the other men could have had a plan to harm the victim. Defendant Walker acknowledged that he identified

Defendant Cooper from a photographic lineup as one of the perpetrators of the offense, but he wrote on the lineup form that he did not witness the shooting.

## II. Sufficiency of the Convicting Evidence

Both Defendants argue that the evidence was insufficient to support their convictions of attempted second degree murder.

In reviewing a defendant's challenge to the sufficiency of the evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed.2d 560, 573 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id.*; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

The offense of second degree murder is defined as "[a] knowing killing of another." T.C.A. § 39-13-210(a)(1). "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." *Id*. § 39-12-101(a)(2). "Conduct does not constitute a substantial step under subdivision (a)(2) unless the person's entire course of action is corroborative of the intent to commit the offense." *Id*. § 39-12-101(b). "A person is criminally responsible for an offense committed by the conduct of another if . . . acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." *Id*. § 39-11-402(2).

Both Defendants essentially challenge the credibility of the State's witnesses. Defendant Cooper argues that there was no credible evidence connecting him to the shooting. Both Defendant Cooper and Defendant Walker testified that Defendant Cooper had walked away from the scene before the shooting started, and the victim, at best, saw only a silhouette of a possible third shooter. Defendant Walker submits that the victim did not initially identify Defendant Walker as an active participant in the shooting although he placed Defendant Walker at the scene. Defendant Walker points to the victim's statement to the police in which the victim said that he saw Defendant Walker before, but not during, the shooting.

The jury was instructed on the elements of the charged offenses as well as on criminal responsibility for the conduct of another individual. The victim testified that Defendant Cooper drove to the Rolling Hill Apartments where the victim was ultimately shot two times in the back of the head. The victim identified the participants in the shooting as Mr. Ellis, Defendant Cooper, and Defendant Walker. The victim was left injured at the apartments, and Defendant Cooper and Defendant Walker drove away without notifying the police or 911.

Mr. Johnson testified that Defendant Cooper told him that he and Defendant Walker initiated contact with the victim and that he, Defendant Walker and Mr. Ellis drove together to pick up the victim. Defendant Cooper said that Mr. Ellis and Defendant Walker shot the victim. Defendant Cooper said that he drove away with Defendant Walker because he assumed the victim was dead.

The jury heard both Defendants' testimony concerning their role in the offense and obviously, by its verdict, accredited the testimony of the State's witnesses and resolved any inconsistencies in the testimony in favor of the State's witnesses. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. *State v. Evans,* 108 S.W.3d 231, 236 (Tenn. 2003). Based on our review of the evidence, we conclude that the evidence was sufficient to support beyond a reasonable doubt each Defendant's conviction of attempted second degree murder. Defendants are not entitled to relief on this issue.

## III. Sentencing Issues

Defendant Walker does not challenge the length of his sentence on appeal. Defendant Cooper contends that the trial court erred in applying three of the seven enhancement factors in determining the length of his sentence. We will address only the specific arguments raised by Defendant Cooper in this appeal.

At the sentencing hearing, the State relied upon Defendant Cooper's pre-sentence report and his record of juvenile adjudications, both of which were introduced as exhibits without objection. According to the pre-sentence report, Defendant Cooper was twenty-four years old at the time of the offense. He dropped out of high school after completing the eleventh grade and worked as a temporary employee for two companies from 2000 until the end of 2002. Defendant Cooper reported that he completed a court-ordered drug rehabilitation program at New Directions, Inc. in 2002 or 2003. Defendant Cooper acknowledged in the pre-sentence report that he had started using marijuana as a teenager, but he noted in the report that he stopped doing so in 2004.

The pre-sentence report reflects that Defendant Cooper has three prior convictions for simple possession of drugs in 2001. He was convicted of driving with a suspended license in 2004.

We note that the legislature has recently amended several provisions of the Criminal Sentencing Reform Act of 1989, which became effective June 7, 2005. However, although Defendant Cooper was sentenced after the effective date of the Act, the crime in this case occurred

prior to June 7, 2005, and Defendant Cooper did not elect to be sentenced under the provisions of the Act by executing a waiver of his ex post facto protections. *See* 2005 Tenn. Pub. Acts ch. 353 § 18. Therefore, this case is not affected by the 2005 amendments, and the statutes cited in this opinion are those that were in effect at the time the instant crimes were committed.

At the conclusion of the sentencing hearing, the trial court found that the following enhancement factors were applicable: enhancement factor (2), Defendant Cooper has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; enhancement factor (3), Defendant Cooper was a leader in the commission of the offense; enhancement factor (7), the personal injuries inflicted upon the victim were particularly great; enhancement factor (9), Defendant Cooper has a previous history of unwillingness to comply with the conditions of a sentence involving release into the community; enhancement factor (10), Defendant Cooper possessed a firearm during the commission of the crime; enhancement factor (11), Defendant Cooper had no hesitation about committing a crime when the risk to human life was high; and enhancement factor (21), Defendant Cooper was adjudicated to have committed a delinquent act as a juvenile which would constitute a felony if committed by an adult. T.C.A. § 40-35-114(2), (3), (7), (9), (10), (11), and (21) (2005). Based on the presence of these enhancement factors and no mitigating factors, the trial court sentenced Defendant to twelve years.

When a defendant challenges the length or the manner of service of his or her sentence, this Court must conduct a *de novo* review with a presumption that the determinations made by the trial court are correct. *Id*. § 40-35-401(d); *State v. Imfeld,* 70 S.W.3d 698, 704 (Tenn. 2002). This presumption, however, is contingent upon an affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Pettus,* 986 S.W.2d 540, 543-44 (Tenn. 1999). If the record fails to show such consideration, the review of the sentence is purely *de novo. State v. Shelton,* 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992).

In making its sentencing determinations the trial court must consider: (1) the evidence presented at the sentencing hearing; (2) the pre-sentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct; (5) any appropriate enhancement and mitigating factors; (6) the defendant's potential or lack of potential for rehabilitation or treatment; and (7) any statements made by Defendant in his own behalf. T.C.A. §§ 40-35-103 and -210; *State v. Williams,* 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995). The defendant bears the burden of showing that his sentence is improper. T.C.A. § 40-35-401(d), Sentencing Commission Comments; *State v. Ashby,* 823 S.W.2d 166, 169 (Tenn. 1991).

Defendant Cooper was convicted of attempted second degree murder, a Class B felony. As a Range I, standard offender, Defendant was subject to a sentence of eight to twelve years. T.C.A. § 40-35-112(a)(2). The presumptive sentence for a Class B felony is the minimum in the range if no enhancement or mitigating factors were present. *Id.* § 40-35-210(c). Procedurally, the trial court starts with the minimum sentence, increasing the sentence within the range as appropriate based upon the existence of enhancement factors, and then, reducing the sentence within the range as appropriate based upon the existence of mitigating factors. *Id.* § 40-35-210(d), (e). The weight to

be afforded an existing factor is left to the trial court's discretion so long as the court complies with the principles of the 1989 Sentencing Reform Act and its findings are adequately supported by the record. *Id.* § 40-35-210, Sentencing Commission Comments.

Defendant does not challenge the trial court's application of enhancement factors (2), (7), (9), and (21). The sole sentencing issue raised on appeal challenges the trial court's consideration of enhancement factors (3), (10), and (11).

A defendant's sentence may be enhanced if he or she "was a leader in the commission of an offense involving two (2) or more criminal actors." T.C.A. § 40-35-114(3). The trial court primarily found this enhancement factor applicable because Defendant drove the others to the scene where the offense was committed. Defendant Cooper argues that his trial testimony clearly established that he drove to the Rolling Hills Apartments because he had business of his own to conduct and not for the purpose of shooting the victim.

First, we observe that "enhancement for being a leader in the commission of an offense does not require that the defendant be the sole leader but only that he be 'a' leader." *State v. Hicks*, 868 S.W.2d 729, 731 (Tenn. Crim. App. 1993). The trial court acknowledged that each of the co-defendants played a different role. Defendant Cooper testified that he was driving the car on the night of the offense. The jury by its verdict obviously rejected Defendant Cooper's theory of defense that he was unaware of Mr. Ellis' and Defendant Walker's intentions that night. The victim testified that Defendant Cooper accused him of acting as a police informant earlier that day. The victim said that Defendant Cooper left the victim alone in the car with Mr. Ellis and Defendant Walker. Based on our review of the record, we conclude that the trial court did not err when it considered Defendant Cooper's role as a leader in the commission of the crime in determining the length of his sentence.

Defendant argues that there was no evidence that he was in possession of a firearm on the night of the offense and contends that the trial court improperly considered enhancement factor (10). Enhancement factor (10) requires a finding that the defendant possessed or employed a firearm during the commission of the offense. *See* T.C.A. § 40-35-114(10). The victim testified that Defendant Cooper exited the vehicle when the group arrived at the Rolling Arms Apartments and walked away. After the initial shots were fired, the victim said that he saw the silhouette of a man and gunfire coming from the direction in which Defendant Cooper had walked. From this evidence, the trial court implicitly found that Defendant Cooper was armed. Since the use of a firearm is not an essential element of attempted second degree murder, it may be considered as an enhancement factor. *State v. Joe Mitchell*, No. W1999-01160-CCA-R3-CD, 2000 WL 633340, at *7 (Tenn. Crim. App., at Jackson, May 12, 2000), *perm. to appeal denied* (Tenn. Dec. 11, 2000). Based on our review of the record, we conclude that the trial court did not err in considering this enhancement factor.

Defendant also challenges the trial court's application of enhancement factor (11), that he had no hesitation about committing a crime when the risk to human life was high. *See* T.C.A. § 40-35-114(11). Defendant argues that a high risk to life is inherent in the offense of attempted second

degree murder committed with a deadly weapon. This Court, however, has concluded that "[a]lthough factor ([11]) is inherent in every homicide case relative to the victim, the trial court may consider this factor when the defendant endangers the lives of people other than the victim." *State v. Kelly*, 34 S.W.3d 471, 480 (Tenn. Crim. App. 2000). The rationale is that when there are others at risk besides the victim, this demonstrates a culpability greater than that required to prove the specific offense. *State v. Jones*, 883 S.W.2d 597, 603 (Tenn. 1994).

The trial court found:

[w]ell, I think [enhancement factor (11)] would apply to some extent. It was early morning hours, and I don't recall any proof of people being in the area . . . . So, the fact that it was two or three in the morning and people may not have been outside doesn't mean that others weren't in danger by firing shots in a populated area such as an apartment complex.

There was no proof that anyone other than the victim was present during the shooting, or at risk during the incident. Ms. McKinney was at home when the shooting occurred, but she testified that she did not hear any gunfire. She also said that the apartment complex was very quiet at night, and that there usually was no traffic or residents outside at that time of the morning. *Compare State v. Jason R. Garner*, No. W1999-01679-CCA-R3-CD, 2003 WL 1193253 (Tenn. Crim. App., at Jackson, Mar. 14, 2003), *perm. to appeal denied* (Tenn. Oct. 16, 2003) (finding that the testimony of those who were present at the time of the shooting and who saw unnamed individuals in the area was sufficient to support application of enhancement factor (11)) *with State v. Anthony Humphrey*, No. W2002-00195-CCA-R3-CD, 2003 WL 21339262 (Tenn. Crim. App., at Jackson, May 16, 2003), *no perm. to appeal filed* (finding that application of enhancement factor (11) was improper when there was no proof in the record of the extent to which others were jeopardized by the discharge of a gun in an apartment complex).

Nonetheless, even if the trial court erred in considering enhancement factor (11), this does not necessarily lead to a reduction in Defendant Cooper's sentence. *See State v. Winfield*, 23 S.W.3d 279, 284 (Tenn. 2000) (observing that the wrongful application of one or more enhancement factors by the trial court does not necessarily lead to a reduction in the length of the sentence). Based on the presence of at least six enhancement factors and no mitigating factors, and our review of the record, we conclude that the trial court did not err in sentencing Defendant Cooper to twelve years for his attempted second degree murder conviction. Defendant is not entitled to relief on this issue.

**CONCLUSION**

After a thorough review, we affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, JUDGE